Please be seated. Your Honor, this is the second case of the morning call, 293-113. Mr. Terry Olson v. Lombard Police Pension Fund and the Village of Lombard. On behalf of Mr. Olson, I hope they're on case. I'll go back. On behalf of Mr. Olson, it's Jerome at Marconi. On behalf of the Lombard Pension Fund, it's Charles Atwell. And for the Village of Lombard, Mr. James B. Brogan. I'll just leave this here if you can move back. Mr. Marconi. May it please the Court. Counsel. My name is Jerry Marconi. I represent the applicant, Terry Olson. Back on September 17, 2013, Officer Olson was a 29-year-old veteran of the Lombard Police Department. I'm going a day before the event. The record indicates, or Mr. Olson testified, that he responded to an active gunman at the ComEd facility. He went there in a full gear, helmet, rifle, and they had to go up and down 13 floors at the ComEd building and Sweet Beach floor looking for this active gunman. I bring that up because at the end of that day, he went home. There was nothing wrong with him. There was nothing wrong with his back. The very next day, in the morning, he gets a call of a burglar in progress. He's the first on the scene. He sees the burglar. He asks for identification. The next thing you know, he's chasing this burglar over various terrain. Then there's basically a hand-to-hand on the ground, and they subdue him. At that point, Terry Olson experiences excruciating pain in his left hamstring. I think the record is clear. In the hospital records, they suspected a tear. So when the ambulance arrived, they had to help him up, and they put him in the ambulance, and they bring him to the hospital. In this case, there is no unbroken chain of events from the time that he went down to the ground. I'll say that the leg injury obviously was the most severe as far as pain-wise. That was the only injury he complained of on that date, right? Well, no, I don't agree with that because in the record, what happens is he testified when he came back to the department. He had to fill out an employee report of injury, and in that employee report of injury, he stated that he had the leg pain, the ankle pain, and then the back pain. So he did state it on the dates that he was there. Now, there's some testimony that he also told the paramedics. There's testimony that he told the emergency room records, but I would concede I did not see any mention of back pain in the ambulance records, nor did I see it in the emergency room. However, Officer Olson went back to Elmhurst Memorial five days later on the 23rd, and in his own writing, it indicated that he had back pain. I think wherever in the record you would see where Officer Olson was able to write down his problems, he would write down back pain. Let's get to the gist of this. The board resolved the factual issues against Mr. Olson, correct? Officer Olson. And tell us why the board's decision is against the manifest way of the evidence. All right. As far as the—I think a lot of the factual issues aren't really in dispute. I mean, I don't think they're disputing the fact that he's disabled. They're not disputing the fact that this event happened. They're not disputing the fact that he injured his leg. So the question becomes causation, and I think that's what the affilees are saying in their briefs. And in the factual presentation, you discussed that he chased the suspect over various terrain. What does that mean? There's no allegation that he jumped over a fence or he jumped off of a roof or he did some other jarring activity that would normally result in some— you know, we've all experienced back pain, right? Right. So he doesn't describe any back pain as a result of crossing that terrain, not to the ambulance personnel. It's not documented. So tell us why the board's decision is against the manifest way of the evidence. Given the description of the injury that he provided. Not what happens later, but— Okay. So he describes his chase over various terrains, and I think what he's saying is it's kind of a commercial area, so he's running across the asphalt, he's running across grass, and then he finally grabs the guy. I don't think there's any evidence that he went over a fence or he had a jump over a car or anything like that. I think that the way he explained it is that when he went down, the leg pain was excruciating. He couldn't stand up. So that was the primary complaint. The factual issue, and I agree you have to defer to the board on this, but they're saying they don't believe Terry Olsen when he testified. I told the paramedics that my back hurt. I told the emergency room physician that my back hurt. But it is in there on that date where he told the supervisor, and it is in there five days later. You all have been telling the truth, and the board could have accepted his testimony and still determined that it was not the result of an on-duty injury, that he had pre-existing conditions from the construction business and other events in his life. Right. So going to your question, where is the nexus? I mean, I think that's just the case. We have this event which he has to chase, and he goes down. Well, then where is the nexus between that and the back surgery? I think everybody agrees that the back surgery was not successful. There was a nonunion, and that is the reason he's disabled, because of the surgery. Now, how does he get to the surgery? And I think that's where, when you look at the medical evidence, you have to look at the individual doctors. Now, they rely on Dr. Ciamo, who, in his report, he says that there was no complaint of back injury for two months after the event. And I think, in the medical records, that's clearly not accurate. I mean, you have Elmer's, you have Atletico, you have his report. So I think when you look at Ciamo, you could take the weight case, as it did with Dr. Milgram's report, and say it's based on erroneous information. So I think Ciamo you have to put aside. But he also agrees completely with Goldberg. Ciamo does. Goldberg isn't relying on that misinformation, is he? No, because Goldberg said he suffered a lumbar, he suffered a back injury. He called it a lumbar strain. And that's the same thing that Dr. Player did in his original report. He said that he suffered a lumbar strain, and that the ultimate disability was a result of his degeneration. So I think Goldberg appreciated the fact that he hurt his back, his lower back. He just didn't think that it was, it didn't cause the need for the surgery. And I think when you look at Goldberg's report, he takes issue with Palenkovic, with his diagnosis that Terry Olsen had spondylolisthesis in his back, and that was the need for the surgery. So I think that's the dispute between Goldberg and Palenkovic. Is the only medical evidence that supports your position Player's second report? I think that is, as far as direct evidence, yes. But then isn't Player's second report somewhat contradicted or impeached by his first report? No, because I think Dr. Player cleared that up in his second report because now he has all of this new information. You now have the surgery performed, and he went through it, and that's when he did kind of what I think Kelly's called a 180 on his opinion. So I think he had more information in the second report. Same thing with Dr. Goldberg. Dr. Goldberg examined Officer Olsen and says, I can't make a decision because I don't have enough stuff. I don't have enough records. I don't have the diagnostic films. And that's why Goldberg had to go back a second time, and that's where he came up with his ultimate conclusion. But, I mean, ultimately the Board had Goldberg and Samuels' opinions. And if the record contains evidence, really any evidence, that supports the agency's factual determination, I mean, we have a standard of review that we have to abide by. Right. I mean, how is – you know, we have the cases, I don't know if it was Condallo or whatever that case was, where there were four doctors on one side, two on the other, and the Board chose to follow the two doctors and disregard the four. Here we have two and one, and the one's opinion is, to some degree, contradicted by the first report. You know, isn't that some evidence in the record, Appellants, the Board committed its determination? I think the key word is competent evidence. And I think when you look at Samuels' report, and, again, I'm going back to the Wade case in the Supreme Court, if it's based on erroneous information, then it's not competent. So I don't think they could consider Samuels' report. What was interesting in this case is they never considered Dr. Pleyer's second report. It's never mentioned in the decision in order, which is a little odd, because I would say that Dr. Pleyer's second report supersedes his first report. As far as, I think it was Dr. Stanley, Stanley didn't say it wasn't related. He says, if you believe, or if Dr. Polankiewicz's diagnosis was correct, then, yes, it's an aggravation of a preexisting condition. So it's almost in this case that the only solid opinion you have is from Dr. Pleyer, which ties up the causation. The other doctors seem to throw up their hands, other than Dr. Samuels, who was the one saying there's no aggravation. You rely on Devaney, the Devaney case? Devaney is very close. But didn't three doctors say he was disabled in Devaney? Well, I think all the doctors here are saying he's disabled. I think with Devaney, the facts are stronger in terms of there was a couple affirmative opinions that his chase and his struggle aggravated his preexisting back condition. I think Devaney had the same. He had prior back surgery, and he had some other, I think, three different complaints of back pain. So I would agree that Devaney's medical is better. He's stronger. He's stronger than here. I think the facts here are stronger than in Devaney, because Devaney I don't think said anything about his back for a month. And, you know, as you know from your own experience, a lot of doctors could be looking at the same patient, and they're going to come up with three different diagnoses. I think these doctors just didn't want to go. Like Dr. Seminoff said, I would just throw up his hands. So I don't have an opinion. I'm not going to. I don't know. Is it an aggravation? I think the strongest facts in this case is kind of that chain where somebody's able to do their job 100% of day one. Day two, they're done. That's the importance of your citing Devaney, is the preexisting condition was fully resolved, as you're arguing here, and then aggravated again by a new chase. Right. And in Devaney, there's no puppy in this. Devaney, they argued, well, the puppy, put the puppy in his lap, but, you know, it was an intervening circumstance. There was nothing intervening here. I think when Officer Olson goes to Atletico on October 3rd, he says, I have back pain. Did they treat it? They treated it after he was done with the order for the leg. So he would have the back pain. It would be in the notes, my back, my back, and then what he had to do is go back to the doctor to get another script for them then to treat his back. But I don't think there was ever any kind of, call it an allegation, or any mention that he hurt his back during physical therapy. You know, this is kind of just a progression from the date of the incident through his physical therapy. Then you could just see they started sending him to a lot of doctors, and all doctors seemed to disagree a little bit. Did he stop doing any construction after the injury? He said he stopped doing the interior demolition, which he was doing a lot. I know that the appellees mentioned that, that go to his credibility. I would argue that it showed that he wasn't 100%. I mean, he was able to go inside homes with a sledgehammer and demolish homes, and he was able to be on the street at 100%. Why did all of this seem to evaporate overnight after the 18th? Isn't the credibility of your client really paramount though here? I mean, he's the only one that knows how he felt after the incident. He's the only one that knows whether his back actually hurt him or not from the incident. He's the only one that knows how he was feeling fine before the chase and after the chase my back was just a mess. And the board fully resolved that against your client, the credibility issue. Well, I think you have to look closely at what did they resolve, because there's not a credibility issue when he writes it down in the employer's statement of injury. Is that the Form 45, or is that this? Yes. In the Form 45, did he say he had back injury? Yes. When we were at the hearing, they said it was the employee's statement of injury, and this is where I think one of the board members went and made six copies of it, and he was explaining how he mentioned that he had a back injury, and then five days later he writes it down in the intake. Do you have a record site for that? Because I have a copy of the Form 45, but maybe it's not complete. The record site is at C-487, and it says in there, caller states employee went to run after a suspect and he pulled his left leg, sprained, strained, lower left leg. I don't see anything about his back injury. I think what you have to do, you have to look at the transcript at C-185, because what we were doing at that point when we showed up for the hearing, there was this original report that was at the village, and it was signed. So what we did was, I think Officer Olson, he gave it to the board, they made six copies. The actual form itself never made it into the administration. I'm looking at the unsigned form that they had, and you had a signed form that had something different on it. And I thought what they were doing is substituting out, because that was Exhibit 2. Was that ever made part of the record on appeal, that form? No, I don't believe it was. I don't know what happened to the form. We talked about the form. They made copies of the form. We were going to substitute it for Exhibit 2. So that discussion is at what C? C-185. And I think I went in and indicated that, and I was talking with the president of the board, that the form that we had in our hand was signed by the employee and his supervisor. And then Trustee Renallo asked if we needed to make copies, and he wanted to make copies of the form. I don't know what happened to that form. There's testimony about it. There's testimony about what he put in the form. When you were preparing all this for hearing, any thought of supplementing the record on appeal with that form? Looking back at it, it should have been something I brought up in the circuit court, not in the appellate court, because that form was not there that we discussed. So I basically relied upon the testimony and the discussion on the record as to what was in the form as opposed to filing a motion to make a supplement. If I had the form, I could have filed the motion. I never had the form. The village had the form. I don't know what happened to it. We put it in the record. They made copies of it. So going back to the credibility question, I think... Your time is up. You can wrap up. All right. Just credibility-wise, I don't think that his issues they point on credibility, I don't think they're on the medical. The medical is the medical. They didn't need his testimony to arrive at their opinions. Thank you. Thank you. You'll have time for rebuttal. Charles Atwell on behalf of the pension board. Mr. Atwell, since he left off with credibility, I'm going to ask you a question about credibility. Was the board looking at the credibility of the police officer or the credibility of the doctors in filing those statements? The credibility issue, as far as what the board addressed, the credibility issue was as far as the plaintiff. Plaintiff. So how could the plaintiff's credibility be questioned when it was consistent with many of the medical and many of the reportings? First of all, the causation issue was virtually every physician that addressed the causation issue found no nexus between the injury and that with the exception of what was mentioned with Dr. Clair. The credibility as far as the witness came in as far as the testimony, that in several of the instances, and I can address those specifically, where he basically said that the first responders, the ambulance, those contemporaneous records, the hospital staff, everybody was well aware that he injured his back, but yet those records don't identify any injury to the back, including the form 45, which the court just addressed. But he subsequently did start to complain about his back, correct? He did subsequently. Began to complain about his back shortly thereafter. Well, it wasn't. I can go through each one of those medicals where he had appointments with the respective physicians that there was nowhere in those records that the back addressed. And so while he says that he did do that, the records do not support that. That is correct. So if we look at C-185 where counsel indicates that the police officer did sign that form that was admitted, will we find that he signed the form indicating that he had back pain? I can't honestly say that I am aware of that. Were you at the hearing? The only thing I know is that the record before us is everything that was in the record. Were you at the hearing? Yes, ma'am. And you don't recall this discussion at the hearing? I recall there may have been a discussion about that, but there was nothing tendered as far as the record was concerned on that. Okay. And can you have a line of duty disability based upon aggravation of a preexisting condition? Yes, you can. And the Board has acknowledged that. But you just submit that there isn't a sufficient negligence. The Board has acknowledged that it can be either a cause. It does not have to be a singular cause. It can be an aggravation. But there must be a record to support that injury. The one thing the Board didn't acknowledge in its written order was the second player report. Can you comment on that? It's our opinion that the second player, Dr. Player first, originally stated that there was no causation as far as the injury. Well, what he said was that any injury from that incident was fully resolved. Yes, as far as the hamstring. As far as the back, he said, as far as the back, I believe Dr. Player, in his original report, said that there was no causation, no nexus between the injury as far as the back and the incident. Then he provided an addendum opinion, apparently believing that there was causation, there was a nexus there, but without any basic analysis or any reason, they changed their opinion. Do you find it unusual that they didn't even comment on that and say what you just said? The Board believed that that evidence was not confident. They did not rely on that. Then if you look at the Board-selected physicians, Sammo, Saminum, and Stanley, none of them drew a nexus between the back and the incident in question. In fact, Dr. Samuels addresses Dr. Goldberg's report, and he agrees with the analysis there or the assessment there, which basically, to me, tells me that he believes there's no nexus between the back and the incident. And it was due to bad surgery. Tell me about what do you make of Dr. Calvo's re-injection. I'm sorry? Is it Dr. Calvo, the report of Calvo? Yes. No way to tie the injury together with the injections? Well, Dr. Calvo, I guess it is. I'll defer to somebody else's. He addressed two, talked about two things. He talked about the preexisting injuries, the one, the 15-year previous vehicle accident where he had sustained injuries to his back, had medical service for that. And he also talks about the intermittent. The intervening since that time up until the accident in question, say, is actually three months prior to the event in question. He sustained a significant injury to his back just merely walking in the kitchen, and he received medical treatment for that. Now, some of the physicians said he did. But before that, he injured it by removing a gun or something, correct? Yes. Some of the physicians, one of the questions on credibility in this is that he did, the board's opinion was he did not, the plaintiff did not provide a full and complete history to the physicians, for the examining physicians. And one of the physicians had mentioned the previous injuries, and he basically denied or said, I don't recall the incident in my kitchen three months ago, and yet he received medical treatment for it. So the physicians also looked at that as far as from the standpoint of the history that he provided, and so did the board look at that. But if we look at the, I mean, I believe everybody agrees this is a manifest way issue. And the board's opinion is not only is there competent evidence, but the record is replete with competent evidence in this upon which the board relied. But if you look at all those medicals, I mean, we have Dr. Galassi, no mention on September 23 of a back injury. The plaintiff says the doctor was aware of it, yet the records do not support that. Then on cross-examination, the plaintiff says he concedes to that. Dr. Hurst, September 23 also. Records do not support any injury to the back. Dr. McManus, October 19, same thing, nothing about the back. The athletical records, 37 visits. He says, well, the reason the back was not addressed is because the insurance didn't have it, so to speak, in their strip. But the fact is the insurance company didn't, and the reason is is because there was no injury to the back identified, and that's the reason that they didn't as far as athletical. Dr. Galassi. The intake form for athletical does mention back. Yes. Okay. Athletical records are very clear that there was no therapy as far as the back was concerned. Well, they mentioned back on the 27th visit, I think, at Adelaide. I think that's the first time that was mentioned. There was no treatment to this gentleman's back, no treatment, until February 17. That's what he testified to. That's five months after the event in question. Dr. Galassi, November 26, 2013. Visit limited to the hamstring. Giannopoulos, November 26 and December 10. No treatment for the back. So I can go through. There's a litany of physicians that we can talk about. And, again, virtually no physician has, except for Dr. Player, in the addendum report, has drawn any conclusion as far as the incident as far as the neck. Does Devaney support the point of submission that any prior back issue was fully resolved before this incident? I believe Devaney is totally different. Number one, there were a significant period of time when Devaney had no circumstances involving the back issue in that particular case. In this case, we had within three months, it's well documented. Also in Devaney, virtually all the physicians through a tied in a nexus between the incident in question and the causation and the back in this particular situation is totally different. Thank you, Mr. Adler. Thank you. Mr. Ferolo. May it please the Court, Counsel, James Ferolo for the Village of Lombard and intervening party in this matter. The question considered below relating to aggravation, just to talk about the theory that the plaintiff is proceeding on, is whether or not there was a preexisting asymptomatic condition that was rendered symptomatic by a work-related incident. In this case, we submit to you that the record is complete and thorough and shows that there was not aggravation of a preexisting asymptomatic condition in this case. Was there a preexisting condition? Yes. There's a back problem. There's a back problem that goes back 15 years. What's really critical in this case is the last time the back flared up was just three months prior to this incident. Three months prior to this incident, it flared up. Well, the plaintiff, Mr. Appellant, Mr. Olson was getting a cup of coffee. Okay. So that was indicative, according to Dr. Stanley, of a significant issue of degeneration in his back. So we have a preexisting condition. Was it asymptomatic? We say clearly it was not because just three months before, it flared up atraumatically.  It flared up because he has a back problem. Was it made worse by this incident? We submit that the record shows clearly that it was not. How do we know? We know that because there was simply no treatment for his back until five months post-incident. How about the surgery? Talk about the surgery. Sure. Well, the surgery occurred long after the incident, and the surgery was a surgery to address what we're saying is a preexisting back condition. A degenerative? A degenerative condition through several levels of his spine. We know that it wasn't made worse because he doesn't complain about his back through any of the early treatment records. Mr. Appellant, we'll just run through those with you. ER, ambulance, Elmhurst Hospital, Dr. Hurst, his personal physician, by the way, five days later, there's nothing about his back on September 23rd. Dr. Galassi, September 23rd, nothing about his back. Athletico, 37 visits, nothing about back pain during all those treatments until December. Until December. And, again, even when he mentions a back issue in December, they don't treat him. He gets treated in February by Dr. Colavo five months later. All of this is talk about the need for some evidence to support the board below. All of this is extremely competent evidence on which the pension board based its decision. If it were anything other than degenerative, would the surgery have been different than it was performed? I would think it would have occurred sooner if it was traumatically related, such as a herniated disc, which happens many times from a trauma. You see a certain, you know, there's a course of conservative treatment attempted and then surgery. This went over a year before the surgery was addressed. The lack of treatment here and the lack of complaints about the back are very, very strong evidence. And with manifest weight, this appellant has a very tough hill to climb in this case. Regarding credibility, another area that the pension board resolved against Mr. Olson on all fronts, he didn't tell any of these doctors of his preexisting back condition. And when confronted by Dr. Stanley with medical records, Dr. Stanley said, what about three months ago at Elmhurst Hospital? His response was, I forgot about that. He went to the ER because his back hurt from getting a cup of coffee, and he simply doesn't tell the doctor who's treating him, who's examining him for a pension based on his back, about his preexisting back condition. You know, I would beg for you someday to find me some cases where the pension board finds the police officer or firefighter credible. Oh, I think, Your Honor, I respect that. I really do, but I don't think these pension boards are trying to. No, I don't either, but there are very few, if any, that I have found that they find them credible. But you ask yourself, why would he not tell? Why don't we see those cases? Because they're not appealed, right? Sure, sure. Right, but why does he not tell these doctors about his preexisting back issue? He hides it. He hides it. He hides it. He hides it because he wants to tie this into a pension. It's very, very simple. Credibility hurdle is very difficult for this appellant to overcome. It's been ruled against him, and I believe his board really should leave that determination undisturbed as the case is direct. We simply have to show you that there's some evidence that this pension board could have her eye on to make this decision. And you should only overturn the decision of the pension board if no rational trier of fact could have agreed with this agency's decision. Clearly, we believe that that's not the case here. There's a strong record. Counseling wants us to disregard Dr. Samuel's opinion because he relied on faulty information. How do you respond to that? I don't think Samuel relied on faulty information at all. I think Samuel looked at Goldberg's report. Samuel examined this petitioner. Samuel looked at records. They determined that there simply was not a back-related component to the work-related incident. I think that's inaccurate. I really do. I think Samuel and Goldberg are lockstep. What this plaintiff appellant has in this record is one doctor that supports his attempt to seek a line-of-duty disability pension, one doctor who did a complete money. And I think when you – well, I know you know this, but when you look at these cases, pension boards have the right to look at doctors' opinions and determine certain opinions are more credible than others. When you look at Dr. Player, he did a one-eighth. His initial report was extremely thorough. And in that initial report, he found unequivocally that there was not a back component to this incident, that there was a lay component, and surgery certainly wasn't warranted due to the first incident. In the second report, based on the actual event of surgery, he changes his mind. And I say to you, why would the result or why would the action of doing the surgery change the opinion of Dr. Player, his initial opinion, as to causation? It shouldn't change it at all. The diagnostics were the same. The facts were the same. The fact that Dr. Polankovic did the surgery really gave Player nothing to go on. So with Player, I think the pension board, I think, Justice Burke, you mentioned, with Player, the pensions board disregarded that opinion. They felt it was incredible. Thank you for your time. Mr. Marconi. Mr. Marconi, how do you respond to the argument that your petitioner's argument just defies common sense, especially in light of what he tells his own physician? Well, that's what I was going to address. I keep hearing about that. If you look at the record, and I'm staring at the registration form for Elmhurst Hospital, and this is from September 23rd, how were you injured? Foot chase. What were you doing when the injury occurred, or where were you? Parkway, south of Roosevelt Road, East Church. What part of your body is injured? Left leg, back, knee, and foot. This is in Officer Olson's handwriting. I don't know how you can call him a liar when you go back to September 23rd and he writes this in a registration form to the hospital. The same thing with Athletico. They keep talking about Athletico. But when he goes there, and I'm citing to C-496, again, outpatient screening form. Olson is completing this form. What problem are you being treated for today? Leg pain, calf, foot, back pain. This is his handwriting within, first of all, a week with him, and then a couple weeks when he's at the physical therapist. What are you here for? Back pain. You would agree that the medical records from Elmhurst Hospital for men don't address any back issues. The ER, I did not see any treatment who was back in the ER report. I didn't see anything where there's no mention of it. But again, he doesn't get the benefit of reviewing those emergency room records and then saying, well, wait a minute, you didn't put the back pain in. I think if you look at what he wrote down, he writes down I'm having back pain. I think the emergency room physician is looking at him and he's crying out in pain with his left leg. The back is so secondary at that point, and I think that's common sense. I mean, if you think you've torn a hamstring, your back's a little sore, that really doesn't, in his mind and probably the doctor's mind, isn't that big of a deal. How do you respond to the argument the counsel makes? You have a surgery, and the surgery was for all intents and purposes for a degenerative disorder. If the surgery, if the back were aggravated or it was as a result of this injury, why would the surgery not have been somewhere else in the spine and not where there was a degenerative condition? Well, I think that's where Dr. Polinkiewicz goes. He had that spondylolisthesis like in 0405, and I think that was where the degeneration, I think he had it at several levels in his back. It just, again, with the chain of events, how do you go from two days in a row, very strenuous duties, not a problem, and then all of a sudden you can't return back to work? And these doctors, you've seen it a lot of times, these doctors seem like they rarely agree on what's, you know, your leg is missing. Can you talk a little bit about the cup of coffee? The cup of coffee, there was an ER report, I believe from Edwards Hospital. It was a heavy roast. Yes, exactly. It was a very high microwave. So apparently he went up to grab his coffee, and he had back pain, both sides, and I think when he went to the emergency room he said, this is similar to what I felt 15 years ago when I got in my auto accident. So it does show at that point that he does have an issue, but there was nothing, you know. It shows that he was still having symptoms from a preexisting condition. Yes, there's no question he had a preexisting condition. And it was not fully resolved by the time this chase occurred. Right, and I think that's the big issue. My argument is because of the fact that he demonstrated by going up and down 13 flights of stairs, tactical gear, that it did fully resolve, otherwise he wouldn't be able to do that. He wouldn't be able to chase the bad guy in the 18th. So that's the thrust of my argument. I'm not going to deny the fact there's an ER report from Edwards, you know, from three months before. I think whether or not he recalled it, I think that's kind of a red herring. We know what happened. We know the doctor knows it happened. We know he reviewed the record. So I don't think that's really a credibility issue so much because it's the doctor who used it in his report. And again, that was Dr. Steenly. Stanley says if Palenkovic is correct and his diagnosis is correct, then I think it's an aggravation of this preexisting condition. So Stanley doesn't say no. He just hedges and says if Palenkovic is right, then there's an aggravation. He says it's lumbar strain. Well, so does Goldberg. Everybody says lumbar. That's what Dr. Player said first. You've got a lumbar strain, you can go back to work. He was hired by the workers' comp. And the reason for the change now that he has a surgery, now Player gets to go back and look at the surgical records, the diagnosis, Palenkovic's records. He says, I was wrong when I said lumbar strain is more serious than that. Thank you very much. Thank you. The Court thanks both parties, all three parties, for their arguments today. And if the case will be taken under advisement, a written decision will be issued in due course. The Court stands in recess. Thanks.